**Electronically Filed
Intermediate Court of Appeals
CAAP-10-0000163
14-MAR-2014
08:09 AM**

NO. CAAP-10-0000163

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
JOE ANTONIO also known as JOSE ANTONIO, Defendant-Appellant.

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CR. NO. 08-1-0751)

MEMORANDUM OPINION
(By: Nakamura, C.J., Fujise and Ginoza, JJ.)

Defendant-Appellant Joe Antonio aka Jose Antonio
(Antonio) appeals from the Circuit Court of the Second Circuit's
(circuit court)[1] October 20, 2010 "Judgment Guilty Conviction and
Sentence" against Antonio for Murder in the Second Degree in
violation of Hawaii Revised Statutes (HRS) § 707-701.5 (1993),[2]
and Carrying or Using a Firearm in the Commission of a Separate
Felony in violation of HRS § 134-21 (2011),[3] following a bench

---

[1]  The Honorable Joel E. August presided.

[2]  HRS § 707-701.5 states in relevant part:

> [§707-701.5] **Murder in the second degree.**  (1) Except
> as provided in section 707-701, a person commits the offense
> of murder in the second degree if the person intentionally
> or knowingly causes the death of another person.

[3]  HRS § 134-21 states in relevant part:

> [§134-21]  **Carrying or use of firearm in the
> commission of a separate felony; penalty.**  (a) It shall be
> unlawful for a person to knowingly carry on the person or
> have within the person's immediate control or intentionally
> (continued...)

trial. This case arises from Antonio's fatal shooting of his son, Jose Antonio, Jr. (JR).

Antonio raises the following points of error on appeal: (1) the State failed to adduce sufficient evidence to establish that Antonio used a semiautomatic firearm, and thus the circuit court erred in imposing a twenty year mandatory minimum sentence pursuant to HRS § 706-660.1(3)(a) (1993); (2) the circuit court erred in permitting Dr. Kathy Long (Dr. Long) to testify because she was not a percipient witness, nor was she an expert witness pursuant to HRE Rule 702, and alternatively, her testimony was beyond the scope of rebuttal and was not based on reliable information; (3) the circuit court erred in striking a portion of Dr. Anthony Manoukian's (Dr. Manoukian) testimony that pertained to the injuries that could occur if the force necessary to break particle board is applied to someone's face, as this testimony was relevant to Antonio's theories of self-defense and that he was under an Extreme Mental or Emotional Disturbance (EMED); (4) the circuit court erred in convicting Antonio of Murder in the Second Degree because the shooting was justified by self-defense or mitigated because Antonio was under EMED and there was insufficient evidence to support the verdict; and (5) Antonio's waiver of his right to a jury trial was invalid because the interpreter was not adequately sworn in, and the circuit court's colloquy was prejudicially inaccurate.

We affirm for the reasons discussed below.

---

[3] (...continued)
> use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; . . .

> . . .

> (b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.

## I. Sufficient Evidence Antonio Used a Semiautomatic Firearm

Antonio argues that the State failed to adduce sufficient evidence to establish that he used a semiautomatic firearm in causing the death of JR, and therefore the circuit court erred in imposing a twenty year mandatory minimum sentence pursuant to HRS § 706-660.1(3)(a).  On appeal, sufficiency of the evidence is reviewed in the light most favorable to the State, and the issue is whether there is substantial evidence to support the conclusion of the trier of fact. See State v. Kaulia, 128 Hawai'i 479, 496, 291 P.3d 377, 394 (2013).

HRS § 706-660.1(4)(c) (1993) defines "[s]emiautomatic firearm" as "any firearm that uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger."

Sergeant Barry Aoki (Officer Aoki) provided the only testimony regarding semiautomatic firearms.  Antonio argues that Officer Aoki's testimony establishes that the *spring* of the gun used by Antonio is used to chamber the fresh cartridge, not the *energy* of the explosive, whereas the definition of "semiautomatic firearm" requires that "the energy of the explosive in a fixed cartridge" be used to "chamber a fresh cartridge with each single pull of the trigger."  Thus, Antonio argues, there is insufficient evidence that the pistol fired by Antonio was in fact a "semiautomatic firearm" pursuant to HRS § 706-660.1(4)(c). Antonio's argument is unpersuasive.  When asked his understanding of what a semiautomatic firearm is, Officer Aoki responded in relevant part that "[t]he firearm will cycle *using the forces from the fire cartridge to* cycle an action to automatically *reload and get another cartridge ready to fire* another bullet to trigger."  (Emphasis added.)  Officer Aoki testified about the firearm used in the shooting as follows:

> Q.  Once the first bullet is discharged - - if the magazine has more than one bullet in it, once the first bullet is discharged from the chamber, what happens to the next bullet?
>
> A.  The gun uses the power from the fired cartridge to cycle so the slide will move to the rear pulling out the empty casing, kicking it out or ejecting it, and when the

3

slide comes forward again, it will push a live cartridge into the chamber getting it ready to fire again.

Q. And as a result of that action, what do you call this firearm?

A. That will be a semiautomatic firearm.

Officer Aoki specifically testified that the subject gun operated in the semiautomatic mode:

Q. What other test did you perform?

A. On this pistol?

Q. Yes. With regards to checking multiple rounds?

A. Okay. During my test firing session with this gun on the last string, I loaded two cartridges into the magazine to see if it will fire in the semiautomatic mode. So the first - - after the magazine was inserted into the gun, the slide was put forward. Live cartridge was in the chamber. It was aimed at the target. Pressed the trigger. It fired that shot. The empty casing was ejected.

And the other - - second cartridge in the magazine was fed into the chamber all under the power of the fired cartridge.

Q. What does that indicate to you?

A. It indicates to me that this gun fires in the semiautomatic mode.

(Emphasis added.)

On redirect, Officer Aoki testified as follows:

Q. Sergeant, when counsel - - defense counsel - - was asking you about what happens when a bullet is fired from the firearm - - remember him asking you those questions regarding that?

A. Yes.

Q. Okay. Would you agree that, that all starts with the energy of the explosive force of the bullet?

MR. PHILIP LOWENTHAL: Well, wait. Wait. Foundation, and I think a matter of physics. That's an open question.

THE COURT: I'm going to overrule the objection.

THE WITNESS: Yes.

(Emphasis added).

Officer Aoki's testimony constitutes substantial evidence that the pistol in question "uses the energy of the explosive in a fixed cartridge to . . . chamber a fresh cartridge

4

with each single pull of the trigger[,]" HRS § 706-660.1(4)(c), and thus Antonio's argument is without merit.

## II. Dr. Long's Testimony

Antonio argues that Dr. Long's testimony constituted improper lay testimony, and that Dr. Long was not qualified to give testimony as an expert. "Generally, the decision whether to admit expert testimony rests in the discretion of the trial court." Barcai v. Betwee, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002).

The circuit court allowed Dr. Long to render opinions without formally designating her as an expert. The Hawai'i Supreme Court recently held that the plain language of HRE Rule 702[4] does not require the circuit court to formally qualify a witness as an expert before receiving the witness's expert testimony into evidence. State v. Metcalfe, 129 Hawai'i 206, 225, 297 P.3d 1062, 1081 (2013); see Barbee v. Queen's Med. Ctr., 119 Hawai'i 136, 154-55, 194 P.3d 1098, 1116-17 (App. 2008) (holding that the circuit court did not abuse its discretion in allowing a witness to give expert testimony but denying a request to qualify the witness as an expert before the jury).

> The plain language of HRE Rule 702 suggests that, to testify as an expert witness, one need only possess the requisite "knowledge, skill, experience, training or education" to offer an opinion on a subject requiring "scientific, technical, or other specialized knowledge[.]" It does not indicate that the trial court must formally qualify a witness as an expert in front of the jury before the witness's testimony can properly be admitted.

Metcalfe, 129 Hawai'i at 225, 297 P.3d at 1081 (brackets in original). In sum, "nothing in the HRE would preclude the trial court from declining to qualify a witness as an expert in front of the jury, so long as the requisite foundation for the witness's testimony is established." Id. at 226, 297 P.3d at 1082. Any concerns about not formally designating a witness as

---

[4] HRE Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

an expert are even less when the case involves a bench trial, like this case.

As in Metcalfe, the evidence in this case satisfied the foundational requirements for expert testimony set forth in HRE Rule 702. See id. In order to provide expert testimony pursuant to HRE Rule 702,

> (1) the witness must be qualified by knowledge, skill, experience, training or education; (2) the testimony must have the capacity to assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the expert's analysis must meet a threshold level of reliability and trustworthiness. *See State v. Torres (Torres I)*, 122 Hawai'i 2, 31, 222 P.3d 409, 438 (App.2009) (citations omitted), *affirmed and corrected on other grounds by, State v. Torres (Torres II)*, 125 Hawai'i 382, 262 P.3d 1006 (2011).

Id. at 227, 297 P.3d at 1083.

Dr. Long's qualifications were presented at trial and based on that testimony the circuit court did not abuse its discretion in allowing her to provide expert testimony in the area of social sciences, particularly in the area of Filipino culture. Her testimony was offered to address how operative beliefs within the Filipino culture affect relationships within the home.

When asked what training she has in the area of Filipino culture, Dr. Long testified as follows:

> Well, the training is specifically through my doctoral degree creating my dissertation, developing my dissertation in immigrant battering. And my training has been through working in many different areas that deal specifically with Filipino immigrants, and being a program supervisor over at the Family Peace Center who we are the only agency that provide Filipino speaking battering program services.

As part of her doctoral dissertation, Dr. Long conducted a vast literature review in Filipino culture. A portion of Dr. Long's dissertation concerned the core values of the Filipino culture.

Dr. Long testified that she has been involved in the Filipino rural program for the past four or five years, and that she is on the advisory board. The Filipino rural program focuses on Filipino culture and addressing the Filipino immigrant needs based on their cultural traditions and practices. When asked

whether she considers herself an expert in Filipino culture, Dr. Long stated:

> I do. I do, sir. And above and beyond my formal education on this, you know, my father and my grandfather are sakadas and we were born and raised in the Filipino culture and its traditions and practices. And we lived in the Kumu kumu camp on Kauai. These beliefs were ingrained.

Thus, the circuit court did not abuse its discretion in determining that Dr. Long was qualified by education, work experience, and her family experience to testify as an expert in Filipino culture.

Antonio next argues that Dr. Long's testimony was unreliable. Antonio points out that Dr. Long only reviewed Dr. David Randall's (Dr. Randall) deposition in rendering her opinions. Furthermore, Antonio argues that Dr. Long failed to indicate that her process in reaching her opinion was accepted or standard practice in her field. However, Antonio cites to no authority to suggest that Dr. Long was required to review additional materials before testifying, or that she was required to explicitly state in her testimony that the process in reaching her opinion was accepted or standard practice in her field. Before testifying, Dr. Long reviewed Dr. Randall's deposition transcript and an email that included the areas that Dr. Randall submitted that he would be discussing.[5] The purpose of Dr. Long's testimony was to directly rebut Dr. Randall's testimony that Antonio's cultural expectation of respect from his family was reasonable and contributed to Antonio's EMED. Further, as to whether Dr. Long should have reviewed other material in rendering her opinion, Antonio was free to cross-examine Dr. Long and challenge the weight that should be given to her opinions.

---

[5] The circuit court qualified Dr. Randall, a clinical psychologist, as an expert in the field of clinical psychology and forensic psychology. Dr. Randall gave his professional opinion that at the time that Antonio shot JR, he was exposed to "extremely unusual and overwhelming stress[,]" and as a result of that stress, Antonio had an extreme emotional reaction to that stress that caused him to lose control, and his reason was overwhelmed by strong, intense feelings that he was experiencing at the time and leading up to the offense. Dr. Randall identified ten chronic stressors leading up to the incident. Chronic stressor number six was Antonio's cultural expectation of respect from his family.

Antonio also contends that Dr. Long's testimony was outside the scope of rebuttal, asserting:

> The State offered her as an expert in Filipino culture, and the circuit court limited her testimony to opinions about certain values within the Filipino culture and how it might affect the family dynamic. Dr. Long, however, opined on irrelevant matters outside the scope regarding domestic violence and the Antonio family's cultural practices, e.g., the family practiced utang ng loob, Antonio was not upholding the expectation as a father, his breakdown caused the "inevitable," Antonio's actions were not consistent to Hiya, Antonio was "motivated by a loss of control over his son" as recognized in domestic violence, and that Antonio chose to live outside the traditional values.

We disagree. The circuit court sustained Antonio's objections as to Dr. Long's testimony concerning domestic violence. Furthermore, to the extent that Dr. Long discussed *utang ng loob*, and stated that Antonio was not upholding the expectation as a father, it was within the scope of rebuttal inasmuch as it directly rebutted Dr. Randall's opinion that Antonio's cultural expectation of respect from his family was a reasonable stressor in the context of Antonio's EMED defense.

III. **Dr. Manoukian's Testimony**

Antonio argues that the circuit court erred in striking a portion of Dr. Manoukian's testimony in which Dr. Manoukian opined that the force it takes to punch a hole in particle board can cause serious injuries if applied to the face. Antonio argues this testimony was relevant to his defenses of self-defense and EMED manslaughter. On the evening of the shooting, there were several confrontations between Antonio and JR, and at one point JR punched a hole in a hallway closet door. Antonio contends this added to his fear that JR would physically hurt him and thus the stricken portion of Dr. Manoukian's testimony was relevant to his self-defense and EMED defenses.

Before Dr. Manoukian offered his testimony, the State objected that Dr. Manoukian was not familiar with the material that JR punched. The circuit court responded, "[w]ell, let's see what foundation is laid." At the end of the defense case, the State again raised the issue and asked the circuit court to strike Dr. Manoukian's testimony regarding injuries that could

result from a punch to the face, because it was not relevant and there was no "tie in" by the defense.  Antonio argued that it was relevant because it provided an objective aspect to Antonio's fear of serious bodily injury from JR.  The circuit court granted the State's motion, stating:

> THE COURT: Well, the Court's going to grant the motion.  The Court has already heard from the witness about his statement of fears based upon what he observed, and I think that, you know, in terms of some kind of analysis about protective force, if you will, I think that becomes more important than anything Dr. Manoukian may have said about what the possibilities would be for someone being harmed by that.
>
> So the Court's going to grant that motion.  And that will be Dr. Manoukian's comments be stricken with regard to the issue that, that force could cause an injury to somebody's face.

Dr. Manoukian testified as an expert witness and "the decision whether to admit expert testimony rests in the discretion of the trial court."  Barcai, 98 Hawai'i at 479, 50 P.3d at 955.  One of the factors for allowing expert testimony is that "the testimony must have the capacity to assist the trier of fact to understand the evidence or to determine a fact in issue." Metcalfe, 129 Hawai'i at 227, 297 P.3d at 1083.  As the trier of fact in the bench trial, the circuit court's explanation of its ruling indicates that Dr. Manoukian's stricken testimony was not helpful given the other evidence in the case.  The circuit court did not abuse its discretion.

There was no testimony that Antonio was afraid of JR inflicting the types of injuries discussed by Dr. Manoukian or that Antonio believed that a punch to the face by JR could result in serious bodily injury.  Antonio also fails to demonstrate that Dr. Manoukian's stricken testimony was an integral part of his self-defense or EMED defenses.  Antonio was able to testify extensively as to his reasons for using deadly force, as well as his fears that JR would hurt him.  Moreover, with respect to Antonio's EMED defense, Antonio was able to provide his testimony, his daughter's (daughter) testimony, and the testimony of his expert, Dr. Randall.  Given all of the other evidence in

the case, we cannot say that the circuit court's striking of Dr. Manoukian's limited expert testimony about injuries to a face from a punch was an abuse of discretion.

## IV. Sufficiency of the Evidence

Antonio challenges the sufficiency of evidence, arguing that the circuit court erred in convicting him of Murder in the Second Degree because the shooting was justified as self-defense or was mitigated because he was under EMED.

> In reviewing the legal sufficiency of the evidence on appeal, the test is whether, viewing the evidence in the light most favorable to the State, substantial evidence exists to support the conclusion of the trier of fact. Substantial evidence is evidence of sufficient quality and probative value to enable a person of reasonable caution to reach a conclusion.

Kaulia, 128 Hawai'i at 496, 291 P.3d at 394 (citations, internal quotation marks and ellipses omitted).

Further, "unchallenged factual findings are deemed to be binding on appeal[.]" Okada Trucking Co. v. Bd. of Water Supply, 97 Hawai'i 450, 459, 40 P.3d 73, 82 (2002). The circuit court's unchallenged findings regarding the events on the evening of the shooting are as follows:

> 6. On December 16, 2008, Defendant had the day off from work. JR came home from work at Safeway in the afternoon and, consistent with his typical endeavors, went into his bedroom to play video games. In connection with playing these video games, JR ran a cord on the floor from his bedroom across the cottage to the living room.

> 7. That afternoon, Zenaida received a telephone call. As a result of that call, Zenaida accused Defendant of having an extramarital affair and of planning to take another woman with him to the Philippines during his pending vacation. This argument between Defendant and Zenaida took place in their bedroom, and was loud enough to be heard by JR and [daughter], who were in other parts of the cottage.

> 8. After this argument, Defendant left the home. When Defendant returned to [home], he joined friends and relatives at a table in the garage on the property. Defendant drank two or three beers in the garage and then went to the cottage to retrieve food for the gathering in the garage.

> 9. When Defendant was in the cottage, he noticed the video game cord on the floor running from the living room to the children's bedroom door. Defendant instructed [daughter] to tell JR to remove the cord. Defendant then went back to the garage and stayed there for several hours.

10.    When Defendant returned to the cottage to eat his dinner, he noticed that the video game cord was still on the floor.  Defendant asked JR to remove the video game cord, but JR did not do so.

11.    Defendant then unplugged the cord, coiled it, and placed it near the children's bedroom.  Defendant then went back to the kitchen to continue eating.

12.    JR then approached Defendant and said, "give me my money now, fucka."  JR had never before used profane language to Defendant.

13.    At that time, Defendant, who owed JR $1,400, gave him about $600 in cash and told JR that he would give him the balance the next day.  JR threw the money back at his father.  Defendant then slapped JR in the face with an open hand.  Zenaida intervened and separated them.

14.    An argument ensued.  During the argument, JR picked up and then lowered one end of the living room couch.

15.    While walking to his bedroom, JR punched the hollow closet door adjacent to Defendant's bedroom.  JR's fist went through the door and left a hole.  At this time, JR was crying.  JR then said to Defendant, "You are hurting us.  You are hurting my Mom."  Defendant attempted to hug JR, but JR pushed him away.  JR continued to say that Defendant was hurting the family.

16.    Defendant then told JR to leave the house.  In response JR demanded full repayment of his money.

17.    Defendant left the house and attempted to withdraw money from an ATM, but was unable to do so.  Defendant called his wife, who told him that she had already withdrawn money from their account.

18.    Defendant returned home after 10:00 p.m., at which time [daughter] was on the computer, JR was in his bedroom, and Zenaida was in her bedroom, which she shared with Defendant.

19.    Defendant met with Zenaida in their room.  Zenaida gave Defendant some of the cash that she had earlier withdrawn.  Defendant went into the children's bedroom, placed the money on top of the bed, and turned to leave.  JR indicated to Defendant that he was not accepting the money.

20.    Defendant returned to his bedroom and called for [daughter].  Defendant then asked [daughter] to go with him to the house of his sister in Kihei.  [Daughter] declined.

21.    Approximately twenty minutes later, Defendant Antonio left his room to get something to drink from the kitchen.

22.    On the way to the kitchen, Defendant again noticed the video game cord on the floor between the children's bedroom and the living room.  Defendant then pulled the cord with enough force to break the cord and then yelled, "I told you I didn't want to see this cord here."  JR, still in his bedroom, began swearing.

23.    Defendant then went back into his own bedroom and unlocked his gun safe in the closet of his bedroom, removed a Colt .45 caliber semiautomatic pistol, and inserted a magazine loaded with .45 caliber ammunition.

24. Defendant is the registered owner of that Colt .45 caliber pistol, serial number FG42893, which was entered in evidence as State's Exhibit S-3.

25. Defendant concealed the Colt .45 caliber pistol in the waistband of his shorts and then covered the firearm with his shirt.

26. Defendant exited the cottage through the front door. Defendant left the solid door open but closed the screen door. He stood outside the house near the door. No exterior light was shining in the area.

27. While Defendant waited outside, JR came out of his bedroom and asked Zenaida where Defendant was. JR then aggressively exited through the screen door, and Defendant took the gun from his waistband.

28. Defendant did not see a weapon in JR's hands but testified that he felt JR's hands near his neck or upper chest.[6]

29. Within a few seconds of JR passing through the front door, Defendant discharged all seven of the rounds of ammunition in his Colt .45 caliber pistol in the direction of JR.

30. There were a total of five gunshot wounds found on the body of JR. One bullet entered JR's neck below and slightly behind JR's ear from a distance of approximately 12 to 18 inches. This shot broke JR's cervical vertebrae and severed his spinal cord, killing JR almost instantly.

31. The other gunshots resulted in a wound across JR's chest, a gunshot wound to JR's left hand, a bullet fragment wound to JR's jaw, and two gunshot wounds through JR's left thigh.

32. One of the bullets fired by Defendant went through the bottom of the screen door, and another bullet went through the solid front door and into the house.

33. Immediately after being struck by the first bullet JR fell to the ground adjacent to the front door. Police found bullet projectiles and ammunition shells around the living room entrance to the Antonio residence. Seven spent .45 caliber casings were found at the scene.

34. Immediately after shooting JR, Defendant dropped the pistol near JR's body and re-entered the cottage where he retrieved his vehicle keys and cellular telephone.

35. Defendant then walked out the front door past JR's body, got into his truck, reversed, and drove down the street in a normal fashion. At some point, Defendant pulled his truck over to the side of the road, stopped, and made several telephone calls from his cellular telephone to relatives and to his alleged girlfriend.

---

[6] In a footnote in his opening brief, Antonio points out that this FOF is incorrect because Antonio testified that JR only had one hand grabbing Antonio's neck area. We agree that this FOF should indicate that Antonio "felt one of JR's hands near his neck or upper chest."

12

36.    Defendant then drove to the police station in Wailuku, where he surrendered and gave a coherent account of the shooting.

Related to Antonio's claim of self-defense, HRS § 703-304(2) (1993 and 2013 Supp.) provides that the use of deadly force is justifiable "if the actor believes that deadly force is necessary to protect himself against" *inter alia* death or serious bodily injury.  Self-defense is not an affirmative defense and therefore the State has the burden of disproving the defense beyond a reasonable doubt.  State v. Lealao, 126 Hawaiʻi 460, 470, 272 P.3d 1227, 1237 (2012).  The circuit court concluded that the State had met its burden to disprove Antonio's claim of self-defense.  The issue on appeal is thus whether there is sufficient evidence to support the circuit court's conclusion.

There are two prongs for assessing a claim of self-defense.

> The first prong is subjective; it requires a determination of whether the defendant had the requisite belief that deadly force was necessary to avert death, serious bodily injury, kidnapping, rape, or forcible sodomy.
>
> . . . .
>
> If the State does not prove beyond a reasonable doubt that the defendant did not have the requisite belief that deadly force was necessary, the factfinder must then proceed to the second prong of the test. *People v. Goetz*, 68 N.Y.2d 96, 114, 506 N.Y.S.2d 18, 29, 497 N.E.2d 41, 52 (1986). This prong is objective; it requires a determination of whether a reasonably prudent person in the same situation as the defendant would have believed that deadly force was necessary for self-protection. *Id.*

State v. Culkin, 97 Hawaiʻi 206, 215, 35 P.3d 233, 242 (2001) (quoting State v. Lubong, 77 Hawaiʻi 429, 433, 886 P.2d 766, 770 (App. 1994).  Thus, the factfinder must "consider whether the use of force was both subjectively necessary and objectively reasonable to determine if self-defense is applicable." Metcalfe, 129 Hawaiʻi at 232, 297 P.3d at 1088.  "The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware *or* as the defendant reasonably believed them to be."  State v.

13

<u>Augustin</u>, 101 Hawai'i 127, 128, 63 P.3d 1097, 1098 (2002) (block quote format altered).

Considering the unchallenged factual findings by the circuit court, and also viewing the evidence in the light most favorable to the prosecution as we are required to do, there is substantial evidence supporting the circuit court's conclusion that the State met its burden of disproving Antonio's claim of self-defense. Antonio and JR got into several confrontations on the evening of the shooting, and JR demonstrated that he was very upset with Antonio, including lifting a couch and punching the closet door. However, JR never threatened to hurt Antonio or initiated any physical touching of Antonio prior to going out the screen door. The evidence further suggests that Antonio did not fear for his life or fear that he was in danger of serious bodily injury from JR. Antonio testified that he became fearful of JR when JR lifted the couch, yet after that incident Antonio left the house, went to the bank, and then returned home. Also after the couch incident, Antonio considered leaving to go to his sister's house, but did not go when his daughter said she did not want to leave with him.

The evidence also indicates that after already having prior confrontations with JR, including the couch incident, Antonio broke the video game cord and yelled at JR. JR began swearing in his bedroom, but there is again no evidence that he threatened to hurt Antonio. Nonetheless, Antonio went to his room, retrieved the firearm and concealed it in the waistband of his shorts. With JR still in his bedroom, Antonio then went outside with the firearm and stood in the dark, leaving the solid door open. According to Antonio, a couple minutes later JR kicked the screen door open and used one hand to grab Antonio's neck area, and said "What do you want, fucka?" In response, Antonio told JR "fuck you." Antonio testified he brought the gun out from his waist when JR let go of his neck. After the shooting, Maui Police Department (MPD) evidence specialist Vincent Soukie (Soukie) processed Antonio at the police station

14

for gunshot residue and testified that he did not observe any injuries on Antonio. The circuit court determined that the State had satisfied its burden of showing that a reasonable person in Antonio's position would not believe that deadly force was necessary to protect himself against death or serious bodily injury. There is substantial evidence to support the circuit court's conclusion.

Similarly, there was substantial evidence to support the circuit court's rejection of Antonio's EMED defense. HRS § 707-702(2) (2013 Supp.) provides that:

> In a prosecution for murder or attempted murder in the first and second degrees it is an _affirmative defense_, which reduces the offense to manslaughter or attempted manslaughter, that the _defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation_. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.

(Emphasis added.) Effective in 2003, HRS § 707-702(2) was amended to _inter alia_ establish EMED is an affirmative defense. See 2003 Haw. Sess. Laws Act 164. "Establishing [EMED] as an affirmative defense requires the defense to prove by a preponderance of the evidence that the defendant suffers from [EMED]." HRS § 707-702 supp. cmt.; see also Conf. Comm. Rep. No. 56, in 2003 Senate Journal, at 973, 2003 House Journal, at 1722.

In its relevant conclusions of law, the circuit court concluded:

> 14. Defendant did prove by a preponderance of the evidence that he was under the influence of extreme mental or emotional disturbance and experiencing significant loss of self control at the time he caused the death of Jose Antonio, Jr.

> 15. Defendant failed to prove by a preponderance of the evidence that there was a reasonable explanation for his extreme mental or emotional disturbance and loss of self control at the time he caused the death of Jose Antonio, Jr.

Because we are reviewing for sufficiency of the evidence on appeal, "the test is whether, viewing the evidence in the light most favorable to the State, substantial evidence exists to support the conclusion of the trier of fact[,]" and

"[s]ubstantial evidence is evidence of sufficient quality and probative value to enable a person of reasonable caution to reach a conclusion." Kaulia, 128 Hawai'i at 496, 291 P.3d at 394 (citations and internal quotation marks omitted).

There is substantial evidence supporting the circuit court's conclusion as the fact finder that Antonio did not prove by a preponderence of the evidence that there was a reasonable explanation for his EMED. The evidence shows, among other things, that there was a family dispute, that Antonio's actions were to a great degree the subject and cause of the dispute, that the dispute and interactions between the family members on the day of the shooting occurred over many hours, that Antonio initiated physical contact by slapping JR, that after at least a twenty minute lull Antonio further aggravated the situation by breaking the video game cord, after which JR began to swear, that Antonio then retrieved his firearm, concealed it in his waistband, went and stood outside, and then shot JR after JR came through the screen door. There is sufficient evidence to support the circuit court's conclusion rejecting Antonio's EMED defense.

## V.   **Waiver of Jury Trial Through Interpreter**

The circuit court held two hearings and conducted two colloquies to address Antonio's waiver of his right to a jury trial. At the first hearing, there was no interpreter, but at the second hearing an interpreter assisted Antonio. Antonio did not challenge his jury trial waiver in the circuit court. On appeal, he argues that his waiver was invalid for two reasons: (1) the circuit court failed to properly administer the oath to the interpreter; and (2) during the second hearing, the circuit court provided incorrect information that unduly influenced Antonio's decision to waive his right to a trial by jury. Referring to the second point, Antonio states in his opening brief that "[b]ut for the erroneous statement, the second colloquy was adequate."

Because it presents a question of constitutional law, the validity of a criminal defendant's waiver of his right to a

16

jury trial is reviewed under the right/wrong standard. State v. Gomez-Lobato, 130 Hawai'i 465, 468-69, 312 P.3d 897, 900-01 (2013). "[W]here it appears from the record that a defendant has voluntarily waived a constitutional right to a jury trial, the defendant carries the burden of demonstrating by a preponderance of the evidence that his/her waiver was involuntary." Id. at 469, 312 P.3d at 901 (citations, quotation marks and brackets omitted). Moreover, "the waiver of a right to a jury trial is reviewed under the totality of the circumstances surrounding the case, taking into account the defendant's background, experience, and conduct." Id. at 470, 312 P.3d at 902 (citation, internal quotation marks and emphasis omitted).

At a November 2, 2009 hearing, without the aid of an interpreter, Antonio indicated that he intended to waive his right to a trial by jury. Antonio indicated that before coming into court, he had sufficient time to talk to his attorneys about his decision to have a trial by judge. The court explained to Antonio in detail the process of a jury trial and the rights that would be afforded to him at a jury trial. Antonio indicated that he understood. Antonio indicated that his attorneys had explained to him all of the different rights that he has with regard to the differences between a judge trial and a jury trial.

The court revisited the issue of jury waiver at a second hearing on April 21, 2010, where Antonio had the assistance of an interpreter. At the beginning of the hearing, the following exchange occurred:

> THE COURT: Good morning. The Court will also note the presence of the interpreter, Mr. Peros. If we could have the interpreter sworn in please.
>
> THE CLERK: Do you solemnly swear - -
>
> THE COURT: No, no, it's a different oath.
>
> MS. MENDES: The interpreter one.
>
> THE CLERK: Oh, the other side. I'm sorry.
> (At which time the interpreter was sworn to interpret from Ilocano into English and English into Ilocano to the best of his ability.)
>
> THE COURT: Ilocano.

17

> THE CLERK: Ilocano.
>
> THE INTERPRETER: Yes, I do.
>
> THE COURT: Thank you.  <u>The interpreter has sort of been sworn</u>.

(Emphasis added.)

At this hearing, the court again explained, this time through an interpreter, the process of a trial by jury, the rights that Antonio would have if he were to choose a jury trial, and that in a trial by judge only the judge would decide if he was guilty or innocent.  Through the interpreter, Antonio indicated that he understood what the court was advising him, that he had spoken with his attorney about his decision to have a trial by a judge instead of a trial by a jury, and that he understood his discussions with his attorney.

Antonio first argues that the interpreter was not properly sworn in, and points to the circuit court's comment that "[t]he interpreter has <u>sort of been sworn</u>."  (Emphasis added.) It is unclear from the record why the circuit court stated that the interpreter was "sort of" sworn in, but Antonio fails to demonstrate that his waiver was involuntary because of the way the interpreter was sworn in.  Antonio does not demonstrate that a flawed oath was read to the interpreter or that the interpreter somehow did not faithfully interpret the proceedings.[7]

Even if the record reflected that the interpreter was improperly sworn, Antonio cites to no authority that indicates that the failure to properly swear an interpreter *per se* results in an invalid waiver of the defendant's rights to a jury trial. "Where the incompetence of the interpreter is claimed by a defendant to have deprived him of a fair trial, the crucial question is: Was the testimony as presented through the interpreter understandable, comprehensible, and intelligible, and

---

[7]  Antonio also does not dispute the circuit court's finding of fact in support of the verdict that "Defendant speaks and understands the English language, however at all relevant and critical stages of these proceedings the defendant was given the benefit of an interpreter who was fluent in English and Ilocano."

if not, whether such deficiency resulted in the denial of the defendant's constitutional rights?"  State v. Casipe, 5 Haw. App. 210, 214, 686 P.2d 28, 32 (1984).  As further explained in Casipe, "[t]here is a rebuttable presumption that an interpreter in the course of performing his official duty has acted regularly."  Id. at 214, 686 P.2d at 33.  In this case, Antonio provided no evidence to rebut the presumption that the interpreter acted regularly.

Antonio also argues that the circuit court provided misinformation when it instructed Antonio that "[a]nybody who knows anything about you or your family or this case would not be permitted to sit as a juror."  Even if we assume that this statement is not entirely correct, we consider the totality of the circumstances, and Antonio has not demonstrated that he did not knowingly, intelligently and voluntarily waive his right to a jury trial.  In this case, the circuit court's colloquy at the second hearing included the four-part colloquy from United States v. Duarte-Higareda, 113 F.3d 1000 (9th Cir. 1997) that the Hawai'i Supreme Court has advised be given.  See State v. Friedman, 93 Hawai'i 63, 69, 996 P.2d 268, 274 (2000) (advising, but not requiring, trial courts to include in jury waiver colloquy that "(1) twelve members of the community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial.") (citation omitted).

Moreover, the circuit court recognized that Antonio's ability to understand English was in question and addressed it. The circuit court held the second hearing as to jury waiver and utilized the services of an interpreter.  Moreover, unlike in Gomez-Lobato where the court only asked the defendant questions about his executing a jury waiver form, the circuit court in this case directly discussed with Antonio the rights that he would be giving up.  During this hearing, Antonio also directly responded to questions about medications he was taking, thus indicating

that he understood English. Further, during the same hearing, while determining whether Antonio would need an interpreter for trial, Antonio's own counsel stated that Antonio "speaks and understands English well," but was concerned if he had to testify at trial. Moreover, the circuit court elicited information about Antonio's background speaking English, with Antonio directly telling the court that he had been working at Maui News for eighteen years, and that he spoke English at work but mostly Ilocano at home.

Given the totality of the circumstances, Antonio has not demonstrated that his jury waiver was involuntary. The circuit court thoroughly explained to Antonio his right to a jury trial with the assistance of an interpreter. Even assuming the challenged statement by the circuit court was incorrect, Antonio has not shown that it affected his waiver.

## VI. Conclusion

We therefore affirm the October 20, 2010 "Judgment Guilty Conviction and Sentence" entered by the Circuit Court of the Second Circuit.

DATED: Honolulu, Hawai'i, March 14, 2014.

On the briefs:

Taryn R. Tomasa
Deputy Public Defender
(Office of the Public Defender)

for Defendant-Appellant

Richard K. Minatoya
Deputy Prosecuting Attorney
County of Maui
(Department of the
    Prosecuting Attorney)

for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge